Good morning, Your Honors. I'm here to pad my resume. I think your resume's going to need a little more than this. I've been told that many times myself. I'm going to try to reserve two minutes for rebuttal. And I do want to address both issues, but I'll start with the search issue, because that goes to the actual conviction, which is, of course, the most fundamental thing for Mr. Walton. This is a case that I would characterize as one where the police and the government want to have their cake and eat it, too. The original focus of our motion to suppress evidence was that this case was like Alazawi and Johnson, where the police came to the door with their guns drawn and made someone come out. But the government and the police all denied that. They claimed, all of them, that no one had their guns out. But then they want to claim that they thought Mr. Walton was armed, and that's the reason they wanted him to come out. Their problem is that at least a couple of things in the record contradict that claim. First, the officers admitted that the reason they went up to the house was to make an arrest. They, quote, formulated a plan, unquote. The get him to open the door, unquote. Second, not a single one of the officers, according to their testimony, had their guns drawn. Yet three different officers testified that it's standard to have guns drawn when you're dealing with a suspect you think is armed or dangerous. And that's, frankly, exactly what common sense would tell you. I don't think there's very many police officers who go up to arrest someone who they think is armed. So the first problem is the officers use subterfuge. They basically lied to Mr. Walton about why they wanted him to come out. The second problem is that they told him to come out. That's what it means when a police officer says he, quote, needs, unquote, you to come out. It doesn't mean, gee whiz, it would be nice if you came out. It means you're supposed to come out. So that's what happened here, and that's why this is not a voluntary accident. This is an arrest in the home. What do we do with the district court's conclusion that Mr. Walton came out because his wife on the telephone told him to do it? The problem with that, Your Honor, is that is a product of what the officers were saying and doing. She was reacting to what they were saying and doing, and that was combined with what the officers were saying and doing. That only happened because the officers were at the door saying something about armed or something about shoot. Well, that's what she said. She thought she heard somebody say. She can't see the situation, so she doesn't know what's going on. So whether she's understood correctly what's going on or whether she's misunderstood, she's telling him to go out, and that's what the district court is finding. What the district court found is that he went out because she told him to go out. But it's also true, well, but she told him to come out because the officers were there saying something about being armed or something about shooting. The testimony by the officers was that they said, we want you to come out. I don't think, officers cannot walk up to someone's door and tell them, quote, we need, unquote, you to come out, and lie to them about why they want them to come out, and then the person comes out and have them say that's not an arrest. Now, Counselor, you've mentioned twice in response to questions that she said she heard them say something about shoot or something about being armed. Where did you get the word armed? No, I did, I, which, no, she didn't say anything about them being armed. The officers talked about being armed. She, but she didn't. What she says is that she thought she said something, that they said something like, we'll shoot the house. Or at least she heard the word shoot. I'm not sure of those exact words, but I do remember hearing the word shoot. So she's got, she has the one word, and on the basis of that, she tells her husband to go out. And the officers said that what they said was, we need to see if you're armed. I don't think they were claiming to remember their exact words, and they may well have said, we need to see if you might shoot or something like that. I don't think those two things are inconsistent, and certainly, whatever she said is a response to and a product, frankly, of them being at the door and what they're saying, I would submit. Yeah, but she may or may not have heard them correctly. And she admits that, that she's not sure that she could hear distinctly what they were saying. She might have heard armed. Maybe they used the word armed and she heard armed. But she hadn't said that, so that's absolute speculation, right? Or, except it's a somewhat similar word to shoot. Or they might have, I'm sorry. What we do know, although the words, the specific words are a little bit ambiguous, because we have no tape recording. We have the memories of his wife. We have the memories of the officers. You know, memories are tricky, but they all testify, more or less, to the same thing. The officers are saying, we told him to come out. We need you to come out because we're worried that you might be armed. And in that conversation, it's easy to imagine that they might have used the word shoot. And she says she heard the word shoot. She might be misremembering. She might have heard the word armed, although she doesn't say that. But the testimony is actually pretty consistent. The police officers were saying something to the effect of, we need you to come out because we are concerned. And I'm now making, using my own words rather than theirs. We are concerned that you may be armed and that we may get some shooting here. Now, whether those are the precise words, I have no way of knowing. The wife, hearing some version of this, tells him, you better get outside. You've got an eight-year-old son in that house and I don't want any shooting going on and endangering him. So my point then is, Your Honor, at that level of generality, I don't think there's any dispute about the evidence. And what the wife, so then what you have is what the wife says is a product of their misrepresentation about why they want him to come out. And so I think even if you could say it was just the wife telling him to go out that made him go out, that's a product or a fruit or caused by their misrepresentation. The bottom line here, what's really troubling about this case is this testimony by the lead It makes it very clear that their whole purpose, their whole intent was to get this guy out of the house by hook or by crook. And I don't have any dispute about that either. That's true. And the problem is that the way they did it was the wrong way. The way you're not allowed to trick someone into coming out, you're not allowed to tell someone they have to come out. What you do in this situation, I have no idea why they did it. Maybe they just didn't want to take the time. Maybe they knew in South Central L.A. someone would believe them over the man at the door. They should have gone and gotten a warrant. There's no reason they couldn't have gone and gotten a warrant. There are no exigent circumstances. Or they could have waited on the sidewalk. I mean, under your theory of the case, they could have waited for him to come out. They could have waited for him to come out. Sooner or later, he's got to come out and get groceries. What if the police say, Mr. Walton, come out, we want to talk with you. And in their minds they're thinking, once we talk with you, of course, we're going to arrest you. Now, does that violate the Fourth Amendment? It gets a lot more fuzzy in a closer call, Your Honor. But that's not what we have here, so you don't need to address that. I think that becomes right in a gray area, frankly. I don't know for certain the answer. I'd rather my facts that I have than those. But I think an argument could possibly be made there. It's a gray area. Somewhere the line gets drawn. But here, they basically acted like we just want to see if you're armed, no big deal. And that's not what it was. I do want to take a couple minutes on the breach of plea agreement issue, unless the Court has more questions on the search issue. The main thing I wanted to emphasize there that I think the Court really needs to understand, and why there was damage here, is this is a case where there was a real chance of getting a below-guideline sentence. First and foremost, you have the Probation Office affirmatively recommending a lower sentence than the guidelines. That doesn't happen very often. And second, there were arguments to support that recommendation. We had very strong evidence that the guns and ammunition were very old and had been left in the house when Mr. Walton's father died before he moved in. And the District Court acknowledged that? Yes. And the government sort of did in its apologetic one-paragraph correction of its erroneous recommendation. Which it did as soon as they realized it had made a mistake. Well, as soon as the defense complained. But yes. Which may have been the same time that the prosecution, that the government realized it had made a mistake. Maybe, though I don't know. Great minds run in the same channel. Go ahead. Second, Mr. Walton's last felony conviction had been in 1996, and he successfully completed and discharged from parole in 2001. Third, he got out and tried to start a career. He got in coursework and a certified nursing assistant and was trying to get a license doing that. I mean, this was a man who there was a strong argument was trying to turn his life around. Obviously, he had the new offense, so he hadn't been completely successful. But there were strong arguments to support that recommendation. He had another new career of selling crack cocaine. Well, or, you know, he was doing it on this occasion or had fallen back. But, I mean, this was a, there was stuff to support that recommendation, and that's why the breach here was really, it was harmful. I'll submit and save what I have for rebuttals, Your Honor. Okay. Good morning, Your Honors. Garth Heyer for the United States. May it please the Court, I'd like to begin with the voluntariness question. The district court here did not clearly err by finding that the defendant voluntarily opened the metal screen door, put himself in public view where he could be arrested. The district court properly found that the reason that the defendant opened the door was because of the statements made to him by his wife. Let me start from sort of general principles here just to make sure I understand your argument and then the consequences of your argument. If he had not been talking to his wife on the telephone, if he had simply come to the door, opened the inner door, the police had said to him, we need for you to come out, intending that he come out so that they could arrest him. In response to the police saying, we need for you to come out, he came out and they arrested him. Would that have been a legal arrest? No, Your Honor. Okay. Putting aside the- What if the police were, had their weapons drawn? I'm sorry, I didn't understand your question. Add to that, what if the police had their weapons drawn? If the police have their weapons drawn and the defendant can clearly see that their weapons are drawn, they're telling him, we need you to come out now. Then you're getting to a point where the person can't voluntarily decide, no, I'm going to stay in. But I thought you even said it was not a proper arrest without their weapons drawn, because that was not my hypothetical. My hypothetical said we needed to come out, he steps out on the porch and they arrest him. I heard you say that that's an illegal arrest. No, no, I'm sorry, Your Honor, then I misspoke. I was saying, no, that would not be involuntary. Well, why is that? I mean, need is, that sounds like a command. What if they had said to him, not need, they had said to him, come out on the porch. And he complied with the command, he came out on the porch, and they arrest him. Is that a legal arrest? That's a much closer call. Why is that even a close call? If they say we need you, we're ordering you to come out. They order him to come out, come out on the porch. He comes out on the porch in compliance with the command, and they arrest him. You say that's a closer call. Why is that even a close call? Because there's much less voluntariness involved in that situation. I would say there would be- Why is there any voluntariness involved in this situation? They issue a command, he complies with the command. I mean, where's the voluntariness? I mean, you're saying that a man faced with police on the porch, they say to come out on the porch, he is, it's a voluntary proposition, whether he decides to comply with that command, instead of saying to you, buzz off? What I'm saying, Your Honor, is at that point, you have to look at many more circumstances. That one fact in a vacuum, I think, makes it a very close call. You'd have to also look into what was the tone of the conversation. Was it the tone of an order, or was it the tone of a request? Were they in uniform? The tone of an order, I think that's- What about a trick? They say, you know, we've got your son out here, we brought him home, we found him out wandering on the sidewalk, come on out. And in fact, they don't have his son at all, and he only finds that out when he gets outside. Is that a legal arrest? That's an illegal arrest. They cannot trick someone into coming out. That's not voluntary. Why is it not then a trick to say, we need you to come out? Well, they didn't need it at all, except for the arrest. Why is that not a trick? Well, the logistic court did credit their testimony that they needed him to come out to determine whether or not he was armed and could shoot them. But credit their testimony. Their undisputed testimony, their own testimony is, we wanted him out there so we could arrest him. I mean, that was their testimony. There's no dispute about that. That's true. But the officers can't operate with multiple motives. And one of the things that is clear here is, yes, they did intend to arrest him. But at the same time, they can also legitimately believe that they need him to come out because they need- But the district judge's ground for saying that this was legal was that he did it in response to his wife telling him to go out, not because of what you're now saying. But he said the totality of the circumstances, and he obviously credited and should have credited the fact that the defendant opened the door in response to what his wife was saying. But the question is- What do you do with the argument that, which is where I started, where I did, the only reason the wife is saying that is that she's saying it in response to the situation that she's figuring out as she listened on the telephone. But the government can't be held responsible for what someone else is going to misinterpret, especially in- Doesn't sound as though she misinterpreted at all. I mean, we may fuss a little bit about the words, but she's hearing basically what the police say they said. That is to say, we want you to come out because we're worried about shooting. Now, the precise words, nobody can remember precisely, but the substance of what she says she heard and the substance of what the police say they said is identical. The government would quibble a little bit with that. We have the officer saying, we need you to come outside. We need to determine if you're armed so that you're not going to shoot us. Oh, there's the word shoot. Boom. Okay. I agree with you, Your Honor. But she's hearing, you know, we need you to come out and shoot. Her conclusion is very different than the reality of what's happening at the time. She, in her mind, is telling her husband, open the door, they're going to shoot the house. But the government can't be held responsible for her reaction to that. She's not thinking, she's not reacting as if what she's heard is they need to determine if he's armed. She's reacting as if what she's heard is they're about to shoot the house. You know, geez, please open the door. That's, what are you thinking? The government can't be held responsible for her, I believe in this case, misinterpretation of hearing the correct word shoot used by the officers on the porch. But, Your Honor, I would turn to the question, even if you excise the wife in this situation, where there's no guns drawn, where the word need is used, where the officers have not made any misrepresentations, they may have an additional motive. I think there's, I have to say that, I mean, I can read the transcript just as you can read the transcript. I've read the, you know, the declarations. There's only one possible conclusion. And the officers don't dispute the conclusion. They came there intending to arrest him. Period. Correct, Your Honor. The inquiry, though, should be, did they? Why did they get a warrant? Well, I don't know who they would have gotten a warrant for at that point. They hadn't identified him as a person. The only evidence in the record is that they had a physical description and a moniker. What they could have done, Your Honor, was simply, as the court previously suggested, was just sit on the house, wait for him to come outside, and then identify him as the person, and then make the arrest. But they did not have him identified at that point.  They didn't. There's no evidence in the record. They knew who this person was, that they had observed selling narcotics. In terms of his actual identity, therefore getting an arrest warrant for Eric Latham Walton. But didn't the informant tell them that this person was selling crack? The informant gave the officers a description, a physical description of the person, and the moniker of Easy. Easy, yeah. Well, they know what those monikers are. What I'm just saying, Your Honor, in this case there's... How long has he lived in the environs of 77th Street? The actual defendant? Yeah. That I don't know, Your Honor. Yeah. But surely they could have stayed outside and waited for him to come out. My guess is, although I am now speculating, they had enough information that they'd sort of entered the address, taken Easy. They could have gotten themselves a warrant. It might have taken them a little while, but they could have gotten one. Correct, Your Honor. The government doesn't dispute that. They could have gotten a telephonic warrant. I don't know if that would have been possible in this case, Your Honor. Why? If... I don't... I would be speculating as to whether or not they'd have to run the address, they'd have to figure out who was there, they'd probably run the rap sheet. I'm speculating now at facts beyond the record. With my two minutes left, I'd like to turn to the breach argument, unless there are any other questions on the voluntariness issue, Your Honors. In this case, Your Honor, the first question is, is there a breach? And the government admits that there's not. Because in this case, you have to view the government's filing in context. The government's filing in which it repeatedly urged the court to apply the guideline level was in response to defendants' position arguing that post Booker, the court should apply a sentence below the guideline level. Now, the government made a mistake and should have put a sentence in there that said, and we recommend and urge the court to sentence defendant to 63 months. But it immediately cured that problem when it was made aware by defendants' counsel in this case. So, everything was before the district court, before the sentencing hearing, the court could evaluate all of the facts, defendant's position, government's position, government's recommendation, that the defendant be sentenced to 63 months, and did so. In that case, there's no breach. Even if this court were to conclude that that were a breach, the question then becomes, what is the remedy? The remedy, which happened here, is specific performance in the district court, which is exactly what occurred. The government enthusiastically recommended 63 months. The earlier attempt is properly seen not as an effort to undermine its bargain for recommendation, but rather a response that the guideline level that the sentencing commission computed in this case for this offense was appropriate, and that the court should stick with it. As for remand to a different judge, even if this court does find a breach and doesn't find it appropriate, such an exercise would be wasteful. All of the information that would be presented, that was presented to the district court, would simply be re-presented to a different district court. All of the information in the government's position. Go ahead. Go ahead. Go ahead. Now, this is only speaking for myself. I'm not yet consulted with my colleagues about this case. I have no difficulty with the sentencing issue. My difficulty is with the earlier issue. Okay. And I want to give you one more shot at giving me the best argument you can. I mean, from the defendant's point of view, the argument really is that what the wife says is not independent of what the police did. And so for me, for the court to have, district court to have said he's doing in response to what his wife told him to do, is no more, is no different from saying, well, he did it because of the situation created by the police. And she might have misheard, although the evidence that she misheard is not very strong. I mean, she says I heard something, and the word shoot was used. Well, it doesn't surprise me at all, given what the police say. Why is the wife somehow an independent cause for his coming out, given that the only thing that's prompting the wife to do this is overhearing on the telephone the situation that the police are creating? The police have to be able to have a consensual encounter with someone inside a house and not be held responsible for the, even though I agree with you, she didn't mishear. But she did come to an erroneous conclusion. Her argument to her husband was not, you need to go out there because they need to determine if you're armed, which is what... Why is that an erroneous conclusion in this neighborhood where she says, you know, there's some danger of some shooting, and I've got an eight-year-old child in that house? I mean, that's not an unreasonable conclusion to say, you know, there's some danger of some shooting, and you get outside. Not at all, and I agree with you, Your Honor. If the officers had said, sir, come out now or we're going to start shooting the house, and the wife said, what are you doing? Open the door, they're going to start shooting the house. We could not rely on the wife. You're on either side. I understand that. I'm trying to point out how, if they were the same, we couldn't rely on that. That is exactly the product of something you're not supposed to do. But she's focusing on the house being shot up. Obviously, coercive. Anyone who opens the door in response to that fear is acting involuntarily. But that's not what the police did here. They didn't lie. They told the defendant why they were there, that they needed to see him, the reason they needed to see him. He didn't open the door, and only after his wife voices her fear about the house being shot up and a child being injured does he open the door, and she's not a government actor in that case. Now, please correct me if I'm wrong, but wasn't there a time when the police saw him outside? He was on a bicycle. There was, Your Honor. So they could have arrested him then. They tried to, Your Honor. They were on foot. He had a bicycle. They pursued him. He fled and escaped. But he seemed to have returned to the house. They weren't there watching him to return to the house? Not any evidence in the record that I see that someone was making sure that he wasn't able to get back into the house. Well, but so they saw him on a bike, and he took off, and they were on foot. They didn't have a car there? The testimony is that they were on foot. They were not able to catch him. The vehicle, I believe, was with the woman to whom he had sold the narcotics. The testimony from officers... Which vehicle was where? They went and arrested... The officers in a vehicle followed the woman who walked away from the house. They took her into custody. Officer Spitz was on foot. He tried to chase the defendant who had a bicycle but was unable to. And then how long after that was it when they knocked on the door? It's not exactly clear, but it appears to be around half an hour, Your Honor. So they were there? By the time they got back to the house. There's no evidence that I see in the record that officers were actually standing by at the house, which would obviously have been ideal because then they would have arrested him in a public place before he was able to enter his residence. Well, they wouldn't want to arrest him in a public place, would they? Because then they'd have no reason to go into the house and look for evidence. No, I wouldn't necessarily agree with that, Your Honor. Why would they want to arrest him in a public place? Because... And they did try to arrest him in a public place. They have probable cause. They don't have a warrant. They've seen him just engaging in illegal activity. They want to gain custody of him. Government would assume after that fact they would speak with him in an attempt to gain his consent to search the residence or, alternatively, apply for a warrant. Unless there's any other questions, Your Honor, the government would submit. Well, if they had him outside, you know, they talked about exigent circumstances and flushing things down the toilet and all the rest of it. They had somebody on the back of the house as well. There's simply no evidence in the record that they were concerned that narcotics would be destroyed or that someone would be harmed. Therefore, we did not base the entry into the home. And there was no entry into the home until after the arrest and consent to search. So the exigent circumstances would really be dealing with either forcing him out of the house or going into the house to search. And that wasn't present in this case. Thank you, Your Honor. All right. Go ahead. We'll give you a minute for rebuttal. I just wanted to point out a couple of factual points and one legal point, Your Honor. First of all, the vehicle had come back after the arrest of the woman. And, in fact, if you read Officer Spitz's declaration, they were driving back. And that was when they saw Mr. Walton again. So the vehicle was back. Second, I believe one of the officers. So they saw him. When they saw him on the bike, they were in the car. I believe so. Or else they had just gotten out of the car. But the car was there, as I read the declaration of the officers. Second, I believe one of the officers. Which officer was that? Spitz. It's at Excerpt of Record 13. Spitz. What line? Paragraph 7. 7. My partner and I drove back to 58, 57, 7th Avenue to arrest Walton for the sale of rock cocaine. As we approached, he looked in our direction and fled on a bicycle. So they were in their car. Yes, that's the way I read it, Your Honor. You see that paragraph? I'll let you answer it. Yes, Your Honor. It's a testimony that he goes on to say that he fled on foot and I walked. It says, Walton then returned to his residence. I approached the front door with officers Gowody and Orazio. We were in plainclothes and our weapons were concealed. That's what he says. I knocked on the security door. Your Honor, it's Excerpt of Record 66, lines 4 through 7. It's his testimony where he makes it clear that he chased on foot and could not comprehend it. So why did he put this in his affidavit? I'm assuming he got out of the car. Well, I mean, why would they do that? If he's on a bike, he'd want to. He may not have been riding a bike in an area that they tracked. We don't know that either. No, we don't. Yeah. A lot of alleys. Second fact, Your Honor, I believe, and I'm not finding it immediately in the record, that one of the officers who testified testified that they were watching the house and saw Mr. Walton return. That's certainly implied by the declarations that say he returned to the house. The third point I wanted to make was they did have a description, if not an exact name. Well, you'll find that. Before you leave, you'll find that. You fill out one of these gum sheets the clerk will give you. All right. I'll do that, Your Honor. And I'll note if I'm mistaken as well, obviously. Third, Your Honor, if you look at Excerpt of Record 12, they had a fairly detailed description and a moniker for Mr. Walton. There is case law that says you can get arrest. They certainly could have gotten a search warrant for the house. And there's case law that says you can get arrest warrants even when you don't have an exact name. I would submit they could have gotten an arrest warrant for this person easy with this description and their description from observing him. Second, it wouldn't surprise me if you ran a Department of Motor Vehicles check or a police records check on this address that you'd come up with the name Eric Walton and you could then go to DMV and look at Eric Walton's picture. The officers could see that was the man and they could get an arrest warrant for a man named Eric Walton. But even if they couldn't do that, they could have gotten an arrest warrant for the man named Easy with his description. And there's case law saying you can get arrest warrants like that without an exact name. I'll submit unless the court has other questions. I think that's it. All right. The matter is submitted. And should I submit the additional form at the clerk's office? Bring it here. Great. OK. Now we come to Marmolejo versus Gonzalez.
judges: Kozinki, Trott, Bea